## DELANEY v. NEW YORK CENT. R. CO.

District Court, S. D. New York.

May 24, 1946.

O'Neill & Danziger, of White Plains, N. Y. (Thomas J. O'Neill and Daniel Danziger, both of White Plains, N. Y., of counsel), for plaintiff.

Frederick L. Wheeler, of New York City (C. Austin White, of New York City, of counsel), for defendant.

CONGER, District Judge.

Suit for personal injuries. Defendant admitted liability. The sole issue before the jury was the amount to be awarded to plaintiff for his injuries and the results therefrom.

The jury rendered a verdict of $165,000 in plaintiff's favor.

Defendant now moves to set aside the verdict on the ground that it is grossly excessive and should be reduced by the court.

Plaintiff at the time of the trial was 30 years of age, married, with one child. He had been working for defendant since May 27, 1944. From that date to the day of the accident [May 3, 1945] he earned $3,608.78.

Prior to that he had worked for the Eureka Shipbuilding Company from September 28, 1943, to May 14, 1944. He entered the employ of this company as a rigger and ended up as Assistant Safety Superintendent—a position of some responsibility.

It appeared that before the accident plaintiff was a young man of good habits, a good family man, cheerful and good natured around the house.

As a result of the accident plaintiff lost both legs about four inches below his buttocks. According to plaintiff's doctors, the stumps at the present time are at a 90° angle from each other and this is so because the abduction muscles have not sufficient strength to pull the stumps together; that in attempting to get the legs in normal position an involuntary tremor occurs. The testimony of plaintiff's physician is that this condition will be permanent. There was some osteoporosis of the pelvic and pubic bones as well as the stumps; that

there was some degeneration or decalcification of the ends of both stumps and sequestration which may or may not require further surgical treatment; that he further had Bell's palsy of the face and one side of his body which is improving and will probably disappear; that in addition he cannot perform the sexual function; there was also testimony of expert and lay witnesses to the effect that plaintiff had suffered a changed personality; that whereas in the past he had been a kind father and husband, he now is morose and irritable to his wife and boy; that he shunned human society because he felt ashamed; that the ordinary and normal things of life he was unable to do without help; that he had to be carried a great deal which was beyond the strength and endurance of his wife and that he might need an attendant to look after him and care for him; that he cannot concentrate on any one thing very long and that he does not sleep well and is restless and nervous.

At the end of the trial I think we all agreed that plaintiff should receive a large and substantial verdict. As far as I was concerned, after I charged the jury I fixed in my mind a certain sum beyond which I felt the verdict should not go. If it approximated that amount, I turned over in my mind just what I would do. Would I set it aside or would I allow it to stand? This sum was beyond that brought in by the jury. When the jury returned a verdict of $165,000 for the plaintiff, my first impression was that it was a large verdict, but one which the jury might return and still not be out of line with the evidence in the case.

Defendant now says that the verdict was grossly excessive and born out of sympathy or prejudice.

Defendant calls attention to the fact that plaintiff's physical condition would naturally produce a sympathetic appeal to the jury; that plaintiff broke down and cried when he was on the witness stand; that his wife who is a cripple testified she could not properly attend plaintiff, and care for his wants; that plaintiff during the trial sat in a wheel chair with his wife on one side of him and his son on the other side. Defendant also complains of certain testimony which it claims tended to inflame the mind of the jury and unduly influence its judgment. In addition defendant contends that plaintiff's counsel in summation inflamed the mind of the jury by his repetition of a charge of an attempt by the defendant to cheat the plaintiff.

■ Of course, plaintiff did sit in a wheel chair. I don't see how that could be helped. Defendant's attorney recognized this in his opening when he asked the jury to try and keep sympathy out of their verdict. The plaintiff did fill up and show emotion when he was first on the stand. This may very well have been due to plaintiff's impaired nerves and the jury may have so considered it.

Plaintiff's wife and boy did sit with him. Mrs. Delaney is a cripple to the extent that she appears to be lame. I really did not notice the lameness the first day or so.

It was a difficult case to try and no doubt difficult for defendant to contest before a jury. However, there was no undue display. Plaintiff did not creep past the jury box on his hands and the stumps of his legs. There was no exhibition of the stumps to the jury.

■ Such alleged objectionable testimony, which I allowed, in my opinion was competent on the issue of plaintiff's condition at and shortly after the accident and on the issue of plaintiff's pain and suffering.

■ That part of the summation of which defendant complains was more or less brought forth as an answer to the statement of defendant's counsel that defendant wanted to be fair to plaintiff and that it had been fair and considerate with him after the accident. The language of plaintiff's attorney was strong and vigorous. It seems to me that perhaps this argument might just as well been left unsaid. However, I feel that the jury was not unduly affected by it.

■ If my charge to the jury was correct, I can't say that in arriving at this verdict of $165,000 that the jury disregarded

my instructions to them. This was an intelligent jury. A check in the Clerk's office discloses the occupation of each juror as follows: .

Men:

1. Salesman
2. Men's furnishings
5. Accountant
6. Collector
7. Clerk
9. Tire Technician
10. Telephone Engineer
11. News Editor
12. Treasurer

Women:

3. Clerk-Typist
4. Housewife & Saleslady (formerly taught music)
8. Housewife (formerly Store Manager)

Even though I might disagree with the amount of the verdict, I have no right to substitute my mind for that of the jury.

A verdict should not be set aside simply because it is excessive in the mind of the Court, but only when it is so grossly excessive as to shock the Court's sense of justice and the impropriety of allowing it to stand is manifest. Jones v. Atlantic Refining Co., D. C., 55 F.Supp. 17.

Loss of future earnings is one element that the jury had to determine. They could very well, without being influenced by any outside factor, have come to the conclusion that plaintiff will never again be able to work.

There are no fixed rules to determine what this might be in terms of dollars. Each case must be judged on its own facts.

The jury, of course, should take into consideration the whole picture; the age of plaintiff, his previous character and ability to work, his intelligence and other personal qualities; the type of work that he did, the wages he had earned; chance of advancement; the depreciation of money at the present time and the fact that it has a purchasing power much less than in the past.

All these and other matters may be considered in arriving at a figure which will represent lost future earnings. It was the jury's function to determine in the exercise of its sound judgment and from its common experience how much plaintiff's earning capacity will suffer.

According to the annuity tables, plaintiff had a 35 year life expectancy. Using the wage figure of $4,000, a year, this would amount to $140,000. This amount must be commuted. If this sum is commuted upon the discount tables at an interest rate of 2 per cent, the award for future loss of earnings would amount to $99,992. Add to this amount $4,000, the loss of earnings of plaintiff from the date of the accident to the date of the trial, and the total amount would be $103,992, leaving about $61,000 for all other damage.

There was testimony on the part of defendant that to purchase an annuity for the life of the beneficiary would cost, from the most desirable companies, as follows:

To yield $3,500 a year Cost $ 95,000.
To yield 4,000 a year Cost 108,098.

From the less desirable companies:

To yield $3,500 a year Cost $104,167.
To yield 4,000 a year Cost 119,048.
To yield 4,600 a year Cost 136,900.

Plaintiff, using as a basis the wage earned by plaintiff while working at the Eureka which was the figure of $4,400 a year, gets the commuted loss of earning figure of $109,991.20. Add to this the loss of actual earnings and we have $113,991.20.

Of course the final figure reached varies with the figure which is used as the interest rate. I left it to the jury to use the interest rate which they felt was the proper one.

I have no way of telling just how much the jury concluded plaintiff's damage for future earnings would be. From the evidence it might very well have been fixed by them at a sum beyond $100,000 which would leave a balance of something less than $65,000 to pay plaintiff for his other damage, to wit: The actual wages lost $4,000; the pain and suffering he has endured to the present time and the pain and suffering

74

that he will endure in the future; the loss of his legs, the resultant disability, inconvenience and the loss of his right to go about on his own legs and to enjoy a normal life; the damage to plaintiff's nerves and nervous system; the loss caused by plaintiff's inability to perform the sexual act; the mental anguish plaintiff has endured up to the present time and the mental anguish he will endure in the future; the fact that plaintiff may be required to hire an attendant to care for him; the loss caused by plaintiff's change in personality; the loss by way of damage for the shame and humiliation plaintiff has suffered and will suffer in the future.

The jury may very well have found from the evidence that plaintiff should be compensated for all of these.

In connection with these items of damage the jury may very well have found from the evidence that plaintiff will never walk again and that he will never be able to wear artificial limbs.

Adding all these items up I can't say that the jury in awarding $165,000 was so far wrong that passion or prejudice is manifested. It was a large verdict. However, I have no right to interfere with with it unless it is so excessive as to appear to have been given under the influence of passion or prejudice.

I just can't feel that this jury's verdict comes under that category.

When there is any margin for a reasonable difference of opinion in the matter, the view of the Court should yield to the verdict of the jury rather than the contrary. Jones v. Atlantic Refining Co., supra, [55 F.Supp. 20]. The following very well sums up my thoughts on the subject:

"The court must respect the verdict of the jury in fact as well as in pretense or theory and must not interfere or substitute its own judgment for that of the jurors, for to do so would violate a constitutional privilege to have the fair verdict of the jury and not the fair verdict of the court." Jones v. Atlantic Refining Co., supra.

Motion denied.

Settle order on notice.